May it please the Court, Matthew Tisillo, Pomerantz LLP, representing lead plaintiff appellant Kazim Acar, additional plaintiff appellants Landrum Emoji, and the putative class of investors. This appeal concerns a billion-dollar security fraud case by Tesla's aggrieved investors. The district court held that plaintiff's factual allegations, quote, had full evidentiary support, so no facts are disputed on the district court. But in these cases, I have a question for you. Mr. Court, you say, well, dismissing the case was prejudice. You argued that that was erroneous and the court should have been dismissed, that the dismissal should have been without prejudice to afford you an opportunity to amend your complaint. Yes, Your Honor. And what I want to know is, what are the allegations that you would propose to have added to the amended complaint, had the dismissal been without prejudice, that would save you from the dismissal that occurred? That's an excellent question, Your Honor. It may be excellent or it may not even be excellent, but it's one that's troubling me. Sure. So I'd like to know, what is the substantial denial of justice that has occurred here by virtue of the form of the dismissal? In answering your question, I'll note, and this is significant, we actually put forward those additional allegations on the record of the district court. In your Rule 59 motion? Well, in our opposition to defendant's Rule 59 motion. Right. They moved to amend the judgment. In your Rule 59 papers? Correct. So we put in those allegations and significantly the district court considered them in reaffirming its judgment. So it looked at those additional allegations, decided on the basis of that and everything else we said. Where do I find those on the record? Yes, Your Honor, I can get those to you. Hang on a second. It's in our opposition papers under Rule 59 motion. I'll answer your substantive question because I try to get the record in sight. The list of additional allegations that we included are as follows. So supplemental confidential witness 15 was Tesla Shock Vibration Durability Lead Engineer. That's found in Record Excerpt 36, Paragraph 44. That witness said that Tesla failed to do proper durability testing on the first 1,000 Model S cars produced, which was a safety hazard. That witness participated in mid-2012 meetings where the battery pack team manager disagreed with the decision to put the battery pack into production that's been designed due to structural flaws. That confidential witness said that the engineers voiced, quote, strong opposition and, quote, were concerned about safety, but defendant must have brushed it off and went into production. Supplemental witness 16, Tesla's Associate Manager of Engineering. And that's in Record Excerpt 36, Paragraph 45. That witness said, and this is also common sense, the battery pack is a structural component of a manufactured product that's heavily regulated and subject to government testing. That confidential witness said the battery pack would have been finalized at least six months before production because to redo it, you know, a month or two earlier would have sorted the clock all over. You would have had to resubmit it for government testing. Counsel, I have a follow-up question to Judge Lucero's question, and that is this. As you said at the beginning of your response to him, the district court was aware of these additional potential allegations at the time, and it ruled that you would not be given another opportunity to amend the second amendment complaint. And the court nonetheless determined that even looking at that, there were either, that the statements were either not false or misleading or that to the extent that some of them might have been, they were not material. And having so ruled, then what's the point of going back and adding them in a formal way and having the court say the same thing again? So, Your Honor, Why wouldn't we just consider that as part of our review? I encourage you to. I think that on a de novo review now, the court is entitled to look at both everything that we allege, which frankly we think should have passed the bluster that the court erred in dismissing the claim on the affirmative statements about the fires, about the refusal to disclose the Mexico fire that was going on, et cetera. The court can certainly turn an eye towards the entire record in making its determination now. Clearly, the statements are great, but if we were to consider these additional allegations here, and go deeper as the judge would have said, and classify some of the problems and the phenomena, then that would satisfy you. In other words, I think we have some case law that supports the thought that we can determine, using our de novo review, whether the complaint can be saved by the proposed amendment or not. And so, would you want us to exercise that opportunity? We certainly cite precedent for, for example, when we've encouraged this court to address the scientific issue while we're here. There are ample cases in this jurisdiction that permit the court to have efficiencies, to not decide the falsity issues and then back down. We had some ruling on Sander, either of us appeal, we're back here again in two years. So certainly there's precedent for doing that. I'm not, I wouldn't go so far as to say that I can amend that appeal, which is I'm sure we could. No, no. In determining whether the district court abused its discretion in denying another opportunity to amend, part of our consideration is whether it would or would not have been futile. Correct. Okay. So in making that determination, if we were to disagree with it and determine that the proposed additional facts would not save the complaint, we have authority to do that, yes? I think that's accurate. I think, as well, we are not limited to the ones that we put into the record of $50. Well, you're not limited, but remember, you had the best. You amended the complaint twice. Once, once. With agreement. Once with agreement, another time. So you had two amendments below, and you're saying to us, the judge abused his discretion by not letting us have another amendment. And the natural question is, well, what would you put in it? Correct. And if you said, I don't know, I think we'd say he didn't abuse his discretion. Correct. So what you said is we would add the things that are in the Rule 59 papers, and so. That's all correct. And I would just clarify a little bit the procedural history. I understand that they were by agreement. One was just changing a party. And when Judge Breyer issued his core ruling denying leave to amend, these facts had not been before him. He entered the order in the judgment. They moved to revise the judgment. And then at that point, we put it in. Let me ask you about those facts. Correct. Were they facts known to you before the time that you filed your response to the Rule 59e motion? Certainly at the time that we filed the response, because they were in the papers. No, I know. Were they known at the point where he amended a year earlier? Yes. You know, were they known at the point when Judge Breyer issued his order dismissing the complaint with prejudice? I don't recall the exact answer to that, because what happened was. . . I want to look at this from Judge Breyer's perspective. Right. You're saying the judge issued it. You come up to the Court of Appeals and say, Judge Breyer abused his discretion. He didn't allow us to amend. And we told him six months later, five months later, that we had a bunch of facts we would have put in the complaint had we been allowed to amend it. And he said to you, did you know those facts back when I was considering the motion to dismiss? And you said, yes. I don't think he would be within the abuse of discretion. Well, now it's too late. My recollection is no. And the procedural history, which we'll recall much more accurately and contemporaneously, is in our 59e papers. But I believe what we did was, once we had the dismissal order, we continued our investigation, as we always want to do. And we discovered additional confidential witnesses. Confidential witnesses we can't contact until they leave the company. So as more former employees left, we continued our investigation. We continued our diligence. And that was important so that we could substantiate that the case was meritorious, et cetera, the issues that issue on the Rule 59 motion. Our amendment history, though, if you look back at the case, this is a standard issue exchange act, 10B case. There's an initial pleading, typically a little thinner, that is filed by some plaintiff. Here it was a non-lead plaintiff named Robert Rahimi. That was 32 pages long. But you then amended it to have a new plaintiff. There's a lead plaintiff process. A court-appointed lead plaintiff gets put into place. The amended complaint that comes after that, standard issue in 10B, that is your operative, meaty complaint. It follows an investigation with confidential witnesses, et cetera. That's the first pleading that the lead plaintiff puts forward. How long after the operative's complaint was the motion to dismiss filed? I want to say the operative, so the first amended complaint was filed April 14th. The second? No, the first amendment. I know. I'm asking about the second. Yes. And then we, so what we did was on the day. June 16th, 2014. Right. And that's the second amended complaint. Correct. The motion to dismiss is filed the same day. Okay. And how long after that does the judge resolve it? The judge entered his, well, we had the oral argument on September, or 26 to 14, where there was a sort of bench decree. The formal order entered in early December of 14. So we're talking about roughly a six-month time period in which, had you discovered new information, you could have amended it. Roughly speaking, though, my practice is typically not to try to amend as the motion to dismiss briefing is going on. As this Court's jurisprudence, you know, if anything, the eminence capital case, for example, says that when you, this is a hard area of the law. There's no discovery. There's heightened pleading burdens. And the asset test is the motion to dismiss. So we do the best we can. Why I'm asking is you say, we discovered new facts. And that's why, to me, it's one thing to tinker with the complaint to deal with technical problems. You're saying, oh, my gosh, we discovered a smoking gun. New facts. Something important. I'm not sure. To me, it would be important to know when you found those out. Because if you were holding them in reserve. No, no. If we had had, you know, a smoking gun confidential witness, notwithstanding the fact that it wasn't in the amended complaint, I certainly would have offered it at the motion to dismiss hearing. I don't know if the judge would have considered it. When approximately did you learn of the new confidential witness? My recollection was that once we got the order, which was the substantive guidance as to what the district court perceived as the infirmities of our case, we then continue an investigation to try to target those weaknesses. We frankly did it in the context of the CCID motion. But, you know, it was also with an eye toward. So it sounds like you. Special amount of appeal. It's an interesting answer. Because it sounds like in that six-month period until the court ruled, you weren't looking for more evidence. No, that's not. That's not accurate. As a matter of my practice, whatever a case is. Well, I'm just trying to understand your responses to my colleague. Because it sounded from your answer like you waited until you got the order identifying weaknesses, and then you decided to go look for more facts. Rather than, you know, we tried to find the people, but we couldn't. I mean, there's a lot of differences. Well, our papers, and this is clear from the Rule 59 papers, Tesla actively impeded our investigation. And we brought this in front of Judge Breyer in opposing the Rule 59 motion. We contacted numerous confidential witnesses, which we detail in our 59 papers. And Tesla was contacting those witnesses and telling them not to speak with us and citing the NDA and threatening, you know, vague legal action. So we were constantly trying to investigate the case throughout. We were thwarted at various points. But rest assured, my practice is to constantly investigate the cases. As I'm litigating, if there's any sort of, you know, real-world development, even the day of the hearing that would impact on the argument, I would have that prepared. The targeted search for confidential witnesses on specific issues was certainly guided and prompted by the judge's order on our motion as amends. Did you want to say something about all that? I would like to, Your Honor. Thank you. Thank you for Mr. Siegel. Thank you, Your Honors. If it pleases the Court, David Siegel of Arella Manila. On behalf of Appellees Tesla and Elon Musk, and I'll accept beginning at the end the Court's questions to counsel. At the Rule 59, on the Rule 59 motion, Judge Breyer not only said that there was evidentiary support sufficient to avoid sanctions, but he added that even with the allegations made, it did not come close. None of the allegations came close to being actionable or converting any of the statements that were challenged. So do we review that conclusion to no vote to see whether or not you should have leaved to amend? Well, I think that the standard on leave to amend is for abuse of discretion. Did the Court abuse its discretion in not permitting leave to amend? But I do believe that this Court has the power to review for futility new allegations. Let's assume something that you won't concede because you shouldn't. Let's assume we look at those new allegations and say, oh my gosh, they really do state a claim. What do we do? I think if the Court were to look at the allegations and determine that there was a lack of futility and no waiver, which are two huge hurdles, then the Court has the power to reverse and remain, obviously. If there are no information, how could there be waiver? Well, because these allegations were put at a minimum in the opposition to the Rule 59 motion. And I'll get to other stages in the process that lead to waiver. But there was no request at that point to amend the judgment and grant leave. Remember, the motion, Rule 59, is brought to modify any judgment. And it was your motion. You were seeking sanctions. Correct. Correct. And in opposing that, if plaintiffs had, as counsel just said, they continue their investigation, and if they find new allegations in what they perceive to be a smoking gun, they raise it, and they ask for leave. They didn't do that. They didn't present to the judge a request, hey, would you please modify your judgment? Rather than they just said, you shouldn't sanction us because we even have more information. Correct. That was their argument. Interestingly, they even said at excerpt to the record, page 30 and paragraph 40 of their opposition, some of these allegations. We have other allegations, and we've chosen not to include them in the complaint. It gets a little confused later on which are the ones they had chosen not to continue because of some questions they had about credibility. But that would be perfectly appropriate when opposing sanctions. Correct. And it's quite a different standard than the standard on whether or not there was a sufficient allegation of falsity here to the legislature. We never addressed the actual meat of the appeal with your opponent, but can you – there's at least a couple statements that the individual defendant makes about we've only had one fire out of every 8,000, I think it was. And you spent 25,000 cars at that point. Well, whatever number. And 100 million miles. Let's assume that the real number was double-banked for a moment. Correct. Because there had been one in a prototype, and it should have been counted. Is that statement, then, materially misleading? Well, no, not in that context. And it's not false. Because a prototype fire would not be subject to this law. Okay, let's assume for a second that it is just for purposes. I'm trying to figure out whether or not the numbers make the statement materially misleading. If they're divided in half, it's equal. Correct. Okay. On that point, wasn't there a fire on the shelf? There were at least two. The plaintiffs alleged three pre-class fires. The first was a prototype, a battery not even installed in a car that somehow combusted. It tells us nothing. The second fire is the one on which they focus, which is the third, which is on a storage cart. That may be the one to which your Honor is referring. Where all that we know from the record is something burned. There's no evidence or allegation as to what caused that fire, when it started, how it started, or actually whether even a battery was involved. The middle fire is the one that they put the statement, really, their case on. That's the fire where in a test, a test of what would happen if there were a fire in a crash, Tesla started the fire. We started the fire. To find out what happened when a fire started. Correct. That's what one does when you're trying to design a safe automobile. If that's out, which I called on the shelf, it's on the cart. Correct. If that's out, and it is out, it tells us nothing. Which is this? The middle one. The December 2011, the one we started, where they said, well, it was called a fire crash test. Therefore, it's relevant to the accuracy of this statement that there had, at the time, Tesla first said there had been no fires observed in a crash test. From a crash, much less, and this is the core of the case, they're alleging that there was a known risk of a high vulnerability to fires being caused from collisions with the undercarriage of the car. That's their whole case. Well, there isn't a single example anywhere in the record of that occurring before the Washington fire. Period. What about the Mexico fire? Mexico's quite different. The Mexico fire, we have someone very late at night driving it over 100 miles an hour. I think one report said 110 miles an hour. All of this is in the record. It's not designed to go that fast. Oh, it's designed to go a bit faster if one wants. Was it being driven outside its design parameters? No, but on the narrow streets of Merida, probably not driven safely at that moment. It goes through a concrete barrier and into a tree. He walks away, and he watches as it catches on fire. Now, no one has ever said quite the opposite. No one has ever said that if you have a violent crash with this car, just like any other car loaded with gasoline, that these high-energy lithium-ion batteries that burn energy and create heat won't catch on fire or cannot catch on fire. It sounds like what you're saying ultimately is that even if the number should have been two instead of one, to use Judge Hurwitz's example, because of the nature of what happened, it wasn't misleading. It wasn't misleading for a number of reasons. The comment to which the court refers was made in direct response to the reported incident. Tell us what you know about the Washington fire, because that was an unusual fire. That was just driven under normal highway collisions, colliding with road debris, and we had a fire. So what happened? Is this going to raise concerns that this new technology is actually not as safe as advertised? Is there going to be a problem? Will there be a recall? You know, should we as investors become concerned that this problem might force redesign? All risks that Tesla had conspicuously and repeatedly disclosed in all of its public securities filings. If there is a fire, these risks could be realized. I guess I'm asking a different question. I'm not sure it's a hospital. No, no, no. I'm just trying to understand what your position is. There's a statement here. There's one fire for every 1,300 gasoline cars. In our case, there's one fire for every 8,000 cars. So our case is five times less likely to have a fire. Our car is five times less likely to have a fire than a gasoline car. Correct. The one fire, of course, that's being counted is the Washington one. At that point, yes. Let's assume we add another one to this. Yes. Let's assume there are two fires for every 8,000 cars. Does that make this statement material and misleading? No. At first, the math changes. Well, and also, Mr. Muskie is a very smart person, but he can't multiply. It's one for every one fire for every 1,800, and there's one, the other one is one for every 8,000. That makes it one in five. I think it makes it one in six. Correct. Which the math also changes as we add more cars. Ms. Ruskin, what the law requires is, if you're going to engage in any kind of a statistical analysis, it doesn't have to be the best statistical analysis. It may not even have to be the right math, but you have to tell people, here's what I've done, here's how I got to it. And I think it was his October 4 blog that the court may be referencing, where he goes through. No, it was an interview on the 11th. Oh, okay. And that's later. Yes. That's later. In this case, is that good enough? Good enough. And, indeed, you know, we're not arguing materiality on this motion to dismiss. We're saying, is that a sufficient enough error? Thank you, because that was really my question. You're arguing lack of materiality. To lead to falsity, you know, and it's not, because it does not. Not in some way. I mean, you've got an airline, new airplane, sitting around and starting, well, spontaneous fires, or they're sitting in a tarmac case, or I don't know if it became a case, but it's called a situation. That certainly warranted pulling all those airplanes and just grounding every one of them until the issue is resolved. They don't go around. Correct. You've got a fire starting at every one out of every 8,000 cars, and you happen to be the guy who got the 8,000th car. It's pretty material to that driver, I suppose. Correct. But the fires didn't just combust, and that's the difference. It wasn't just the batteries. Well, that's right. That's what I asked about. The one on the shelf, you called it on the fire. The other question, though, is what is material to a potential? What is material to a passenger getting on an airplane, and what is material to an investor? Maybe two different things. Quite different. Because an investor may be willing to put up with risk that a passenger is not, and vice versa. An investor in an innovative product, the first of its kind, has to be willing to at least stomach a little bit of risk in a car. Any car, I submit to the court, any car, that given the right circumstances in a collision, there may be a fire. There may be lots of things that happen to that car in a collision that creates risk. And investors, a company discloses that risk, as Tesla did conspicuously,  Now, they challenge and quarrel with some of the decisions made with respect to engineering. And I'm going to get back to the court's opening lines about, what are these new witnesses? What might they add? Because the question is answered, nothing. They add nothing. And one of the ways they don't add anything is it's just more evidence if we take it at face value. It's not pled. It's just in their response on the opposition to the Rule 59 motion. You're telling us there was a complaint there. We will not find a motion to amend the complaint. Is that correct? Well, there was an earlier motion, but not after the judgment, not after the motion to dismiss. And indeed, Your Honors, first, the second amended complaint did not just change the name on the caption. It added some substantive allocations. Indeed, it added one that they highlighted in opposition to the motion to dismiss discussing how somehow a fourth quarter fire in an event made third quarter financial statements actionable, and that was not carried forward. Then in response to the motion to dismiss itself, they submitted additional factual arguments and purported evidence that they wanted the court to conclude, consider, and the court did. That had no validity either. It was a fire in, I think, a Toronto garage. And the one thing you could tell from the photo that they supplied is the one area that didn't burn was where the battery pack was. And so that went nowhere. And at the hearing, the court said, this is it. Make your best argument. Tell me anything you've got. And he had expressed some skepticism with what they had. So what they have now are a confidential witness 16 who speculates that, well, the battery would not have been changed with six months left. And it's just they would not have been changing it with only six months to go to production. That's just speculation. And CW15, whose hawks got, well, I thought that they needed to make other changes, that it wasn't yet safe enough. That's the kind of engineering debate that tells us nothing about securities fraud. And that's what Judge Breyer found very strongly when he said, don't come in and just second-guess engineering decisions and say they could have made it safer. It's fraud by hindsight, not permitted in this or any circuit. And as the Allison and Ronconi court know, any time you're innovating, you're going to make tradeoffs in decisions. And so that doesn't take them anywhere either. And, indeed, our engineering decisions, which, as the record reflects, included adding a quarter-inch of armored paneling under the car's undercarriage, putting in firewalls internally instead of protective sleeves, around 11,000 cells, led us to believe, as the second amended complaint acknowledged in paragraph 101, that we had designed the same car. In the midst of testing, validated that. And after the first fire, we made an optional and voluntary upgrade of technology to allow the driver to raise the car. That's after the third fire, I'm sorry, in Tennessee. And that was not the stuff of securities fraud. Thank you, counsel. Your Honors, if I may, I'd like to focus on the merits of the ill-for-a-woman. Judge Cicero, you were asking about the pre-class period fires. And I think the December 19, 2011 fire warrants a bit of discussion. The uncontested fire department report states that was a, quote, crash fire test. And a confidential witness, one, says that that was induced at the center of the battery pack. So what was TESLA doing? TESLA was basically testing the exact events that occur in Washington and Tennessee fires later in the class period. They were trying to figure out when a crash would throw a debris in the center of the battery pack, what happens? Yes, but isn't that a whole different animal? I mean, if the question is how many, let's say the question is how often does this car crash into a tree, and the designer causes on purpose to have it crash into a tree to see what follows from that. I don't see how you can count that as an incident of it crashing into a tree. It's part of the testing and design process. It's not, I guess I just have difficulty. TESLA said the Model S under the MIM battery did not catch fire at any time before NHTSA testing. Well, setting it on fire on purpose to see what happens is not the same as catching fire. They induced a puncture of the battery pack in the center. They expected perhaps, you know, a battery, one battery might smoke a bit. What happened was a thermal runaway event that destroyed the car in minutes. It required 23 first responders from nine units on the scene. TESLA concealed those facts from its employees. It concealed them from the first responders. It's just my difficulty. Everybody, even Mr. Musk who says, the car case only catches on fire because of the battery. He says one in 8,000. Maybe it's, you know, maybe it's few. They've demonstrated that in their pre-production stuff. There is a danger of it catching on fire. The question is what is the level of the danger, correct? And so I'm not sure how you can count the test that demonstrates that the level of the danger. They've made these decisions, compromising safety as we describe them, that lowers the car at highway speed. They removed patented undercarriage shielding that was available. They removed individual. But you're not making a car safety argument. You're making a misrepresentation argument. Correct. And we all agree that what was out in public was that there was a car fire at the time of this, at the time of the class allegations. There was one in Washington. That was the first one that occurred. Okay, so we know that it's, we know that the investor class knows that it's possible for the car to catch on fire. To some degree, but they described it as unusual. They say it doesn't occur very often. It occurs one every 8,000 times. And I'm not sure why it is that it's relevant to that, that during testing they actually demonstrated that it could catch on fire. They described that event as unusual, as peculiar. Even after the third fire, they said there's no need for a recall. They basically talked us off. But there wasn't a recall. Well. There, in fact, was not a recall. Saying that there's no need for a recall conveys that there's nothing wrong with the vehicle. The fact that a week later they issued, my car is not as hit as a Model S. If my car needed to be raised, I'd have to take it to the dealership, a mechanic would lift it up, et cetera. The Model S allows that adjustment to be done over the air. They raised every Model S a week after. So what? That's not a recall. That is, as we allege, those are steps cannot be recalled. And if you look at this court's decision in Hannon, for example, where there were optimistic statements about a product, and a senior vice president's diary entries from prior to that were deemed to be sufficient to make those misstatements actionable. Or in the Supreme Court's matrix decision, where there were statements about safety, and we have non-statistically significant adverse event reports in the background, and that was deemed to make those statements misleading. Here we have conscious decisions that make the very circumstances of the Washington and Tennessee fires more likely. We have defendants knowing that if that battery pack gets punctured, that car is going to be destroyed in two minutes. Investors had no idea that that was a material risk of this product, and it's the only product that does that. One question, and I think you can answer yes or no. Sure. I suspect you won't, but I just think you should. You can if there are two different things. You put these facts in your response to the Rule 59 motion to amend, when the other side was seeking sanctions. Was your opponent correct in saying that at that time, you did not seek leave of the court to have the judgment vacated so you could amend your complaint? We had a standing request to amend. No. What we said in the Rule 59 motion, I can remember this. You said you would have put this in an amended complaint and listed what they were. After hearing that, the judge then. No, no. I'm asking a very specific question. You responded to the Rule 59 motion with a response with some facts in it. Did you say to the judge, we would like you, judge, to vacate the judgment so we may file a third amended complaint to allege these facts? All we said was that we would include these in a third amended complaint. Thank you. Thank you, counsel. The case just started. It was submitted. And we appreciate both counsel's very interesting arguments.
judges: Lucero, Graber, Hurwitz